Case No. 18-1241F, NCCH, Inc. v. Federal Communications Commissioner, Mr. Evans, or NCCCH, Inc. Mr. Chairman, I've asked to reserve two minutes for rebuttal. This case presents a very novel situation that I've never seen in my 40-some years of practicing communications law. And there's two basic issues that we have to look at. One is the substantive error of the Commission basically accepting cash for benefits. I mean, to me, that seems like a huge corruption of the administrative process that just cannot be allowed to stand. And if I have time, I'll run through how that corruptive effect spread its way through this entire proceeding and even spilled over to the proceeding that we just talked about, where the Commission did something that affected the earlier license decision. So we have the substance of the Commission's error, which is very, very fundamental. And then we have the question that the Commission has raised as to whether we have standing to challenge that. I want to start by just quoting. I don't usually do this, but we put in our brief a quote from the HBO case, which basically says that when an administrative agency tries to justify its actions by referring to what's in the public record but not revealing things that are not in the public record, which it in fact relied upon,  the Commission cannot presume that the agency has acted properly but must treat the agency's justifications as a fictional account of the actual decision-making process and must perforce find its actions arbitrary. This is the epitome of a situation where the agency has created a fictional account of its decision-making process. From the very beginning, the FCC dissembled and concealed what it was doing in this contract or agreement. Wasn't the information about the reserve price and the waiver in the public record but not in the public record that you think it should be in? It was sort of in the public record. The quid pro quo was in the record of the agency. No, this is not like HBO at all, because HBO wasn't in any record. There was no record? Well, the quotation in my recollection of the case is that it was not public. This is public. Your argument here is just that it was in a different public record. Well, but my point is HBO talks about the information in the public file. The FCC has 1,000 public files. Right, but you knew about this one, right? I, why was it, yes. In fact, you made, I don't mean you personally, but your client, and made filings. Yes. So for whatever argument you want to make about the public at large, your standing depends on an argument you yourself can make, and you yourself, as your client, knew. Well, I'm not basing my standing on the fact that the commission concealed it. To me, that's part of the corruptive effect of this. I thought that's what she told us when you stood up. I thought that's what she said. No. No? No, what I'm saying is we were able to find out about it, and that's why we objected to what the commission was doing. But in the context of the Auction 96 proceeding, there were a lot of people that were interested in that. I don't know that all of them found out about it, because they happened not to look into a completely separate and distinct file that had nothing to do with Auction 96. So your argument is based on injury to somebody other than you. No. The injury is to us, because once we found out about it, or actually. . . It's not like you secretly found out about it. But it was filed in the public file in the waiver proceeding. Well, but that was in a completely different case. The commission says, well, they were obligated under their due diligence obligation to look, I guess, in every other single proceeding of the FCC. . . I don't think we're getting very far here. Regardless of whether you were obligated or not, you actually did find out about it. We did find out about it. Okay. But that's not the basis for our standing. The basis for our standing is once we found out about it, that's when we realized that the auction process had basically been rigged in favor of DISH. That's why we decided not to go forward with the, to participate in the auction. And interestingly, the other major commenters who had been extremely interested in this also decided not to go forward and participate in the auction. I don't know their thinking, but Sprint, for example, was the licensee of the Spectrum Act directly adjacent to the H block. They were extremely interested in the process and in participating, and they ended up not participating in the auction, just like we did. I think everybody that was aware of what was going on realized that the auction was going to be skewed. Can you say something about your standing in the waiver matter? Well, in the waiver matter, I think the commission's position that the waiver is distinct from what was happening in Auction 96. Our position, it was part and parcel of what was happening in Auction 96 because that was the quid for the pro of DISH bidding the $1.5 billion in the auction. So you can't treat the two separately. You can't say that the waiver could be granted without understanding that there was a corrupt monetary influence on that. The two are tied together. That's what establishes our standing. In other words, you couldn't say that it was wrong to allow the $1.5 billion to be committed to, but it was okay for the commission to give them what the $1.5 billion was purchasing. That's our position. Just to continue on Judge Garland's question on the standing question, if we think you do have standing, the commission says that we should remand it because the commission hasn't really responded on the merits, and you didn't say anything about that in your reply brief. What do you think about that? I think you need to vacate the Auction 96 auction. But the commission says it hasn't addressed the merits of your arguments. That's on the waiver question. Yeah. I'm only talking about the waiver issue. Right. Okay. I mean, I guess if you're going to say that the waiver issue could be remanded, that would be right. Well, okay. Great. I only asked you that because that's what the commission says in its brief. So that would be okay with you. Well, I thought that they were complaining that you shouldn't order the auction to be redone because Dish had invested millions of dollars. There's two separate arguments. Two separate points. One is that they only address standing in resolving the waiver. And as Judge Hadle points out, appropriate remedy appears to be remand, and you appear to agree to that. The separate question is about the auction, because they did address the merits of your argument, regardless of what they thought about waiver. Yeah. I think that's right. And I suppose in the context of a remand to consider the waiver, the commission would have to actually acknowledge that it did have this deal, which it didn't acknowledge. Do you have standing to challenge the waiver separate and apart from your argument that the process was tainted by this backroom deal? It sounds to me like you've suggested that your standing to challenge the waivers is inextricably intertwined with your argument that there was a backroom deal. Yes. I would say it is. So if for whatever reason we rejected your argument on the merits regarding the backroom deal, would you have standing to challenge the waiver on any other grounds? Well, I mean, the commission sought, you know, comments on the waiver. We did mention that because we wanted to be an applicant in auction, and, you know, the interface for auction, the one that the waiver dealt with, actually, the one that we dealt with earlier this morning, that if the commission, you know, granted a waiver, that would impede our ability to more quickly have the auction and have our chance to apply for a license. I'll admit that that's a bit thin, but that is the reality because if the commission, for example, if the commission had not granted the waiver that it granted here and extended the deadline for a dish to complete its build-out, they wouldn't have a license as of March, March of 2020. And then presumably the commission would have to come up with some new way to deal with the spectrum that's now available, and then we would have a new opportunity to come in and say, well, now you can give it to us. None of the considerations that you were concerned about before are there. You can hold a fair auction, you know, uncorrupted by the $1.5 billion. So I have a technical question while you're thinking about the next question. So this relates to your challenge to the reserve price and how that was set. Your theory is that DISH's control of the AWS-IV spectrum can affect the value of the H block, right? Could you just explain that to me? How does that work? Well, everybody agreed to this. Everybody agreed, including DISH and the commission, that if the uplink-downlink portion of the AWS-IV spectrum that was adjacent to the H block was split, that it would increase if they moved it to a downlink. It would do what? If they switched it from being uplink spectrum in the AWS-IV band to downlink spectrum in the AWS-IV band, that would make the H block more valuable. I'm just asking why. That's all. Because it eliminates some of the technical difficulties that would have been inherent in having the two spectrum blocks be right next to each other. In the AWS-IV order, the commission spent probably 10 pages dealing with how are we going to deal with the uplink-downlink. And after all that time and a year of consideration, they decided it should be uplink. That's what we've decided. That's what's in the public interest after looking at the total record. And what's sort of weird here is that DISH comes in a few months later and says, no, no, it should be downlink, and the commission totally agrees. The other thing about the uplink-downlink business is that the commission actually conceded, this is a little surprising, they conceded that by making the AWS-IV block downlink, it effectively made a whole expanded block if it went into the H block as well, which was downlink. And it said that would be a benefit, but it would only be a benefit to DISH. The assumption was that DISH would get the H block, which, of course, was correct, since it had basically, you know, rigged the auction so that DISH would be the winner. Commission, I'm curious about another aspect. The commission says your arguments about the reserve price are procedurally barred because you failed to, quote, specify with particularity the factors which warrant consideration. That's a quote from their regulation. And you respond to that by saying that these rules just require it to, require you to identify briefly what the issues are from that list of five. But, number one, you don't cite anything for that, at least not in your brief. And number two, we defer to the commission's interpretation of its own regulation, and it's telling us that particularity means particularity, which you haven't done. How could we, so sort of echoing the argument I made in our first case, for you to prevail on this issue, you have to, you have to, you have to make your case in the context of that very deferential standard review. How do we, how do you convince this Court, what's your best argument, that we should, that this Court should, should decide, notwithstanding what the commission says, that you did make these basis for your objections known, quote, with particularity? How do we do that? My best argument is that we, we complied with the, the text of the rule. The rule... Well, but the commission interprets the rule differently from you. It says particularity. Well, we... Not a brief identification of which one. Well, remember, what the, what the rule calls for is you to specify that the categories... With particularity. Well, we specified the categories with particularity, but... But you're not, my question is, commission is saying here that particularity means something more than identifying which of the five categories you're raising. Well, I mean, what we did, I mean, the way the, the way the rule is set up, you're supposed to identify questions presented, for example, and, you know, the categories of error which you... Well, let me, let me just give you an example, okay? You say, you say adopting a reserve price based on a deal with a potential auctioneer is, quote, unprecedented. That's one of your arguments. But the commission, particularity would require, I mean, number one, how do you know that? And what, what's your authority for it? In other words, here's another example. You say that the reserve price is contrary to precedent. What precedent? That's the point I think the commission is making. Well, that's what we, that's what we included in the, in the main text of our application for review. Okay. What precedent? Pardon me? What precedent? What precedent, what precedent relates to... You say, you say, you say that, that the reserve price is contrary to precedent. That's what you said in your petition. What precedent? I didn't see anything there. Maybe I missed it. In the application for review? Yeah. Well, well, what we refer to was the, was the, was the way the commission usually sets the reserve price. And in this case, the commission looked at, I don't think we, I don't think we stated this in particular, but we stated that it was not the way the commission usually, usually sets the reserve price. For one thing, the commission here looked at, at second, secondary market prices that people had gotten for Spectrum, which is not what the commission would use that as. Secondary market Spectrum is obviously always going to be higher priced than what the price paid in the auction was, because people sell their Spectrum in order to make a profit. So that was a completely improper basis for comparison. But, but, you know, more importantly, the reserve price setting was corrupted by the 1.5 billion. And that was what drove exactly the 50 cents per megahertz pop that they, the commission set. That even though there was nothing else in the record that supported that particular price, that's what the price became. And that's, that's what I'm saying is the corruptive effect of this 1.5 billion dollar offer. It, it, it tainted every single thing that the commission did. Mr. Evans, you started the oral argument with us by citing the Supreme Court's case in HBO. I was surprised that you haven't spoken about the Supreme Court's recent case, the census case. Because it seems to me that that case is a little, much closer to our case than, than the HBO case. And in that case, the Court made clear that, that we're not supposed to look beyond the stated reasons that an agency gives for its action unless, and I quote, there's a strong showing of bad faith or improper behavior. You need to make a strong showing of bad faith or improper behavior. Here. And, and so what is that, and, and here, as I take it, you, you've argued that it was the, the lack of disclosure of the agreement. But we already stated that, that was actually in the public record. Isn't that much different than? Well, no. It's not just the lack of disclosure. It's the fact of this unholy agreement between one, one potential participant in the auction that gave it a benefit, and it, it was going to get an extra benefit beyond what it was bidding for in the auction that no other participants in the auction had. So it's the substance of that. And then it was concealed, which makes it worse. But it's the substance of that agreement, which is the bad behavior, if you want to put it into context. But, but the Court also said that, that you can only, you can only take advantage, you can only get around the stated reason for what the agency's saying if that reason seems to have been contrived. There's no basis for that reason. And yet here we, we have ample basis for the reason. We, we don't have ample basis, at least on the reserve price. None of the, none of the, there was very little that was put in on the reserve price. Dish put in an ex parte letter at the last minute, and they said, oh, it's been estimated to be 50 megahertz per pop. But they didn't say how they came up with that number. They had other figures that were pulled from here and there. But none of them were 50 megahertz, 50 cents per megahertz pop. But it so happened, of course, that that was the amount that they had said that they were willing to bid. And that has to be what drove the Commission's decision. Because once, once it set that, once it set that as the reserve price, it was tied, it was hitched to Dish's wagon. Then it basically had to grant the petition for waiver, because by that point, Sprint and the other big players had dropped out, and the Commission basically had to be thinking, we're not going to get enough in this auction unless we accept Dish's deal, which they did. So you could see that at the time we were trying to decide what to do, and the other potential participants were trying to decide what to do, you could see that you had to, you know, look at the Commission's acceptance of the 50 megahertz, 50 cents per megahertz pop price as an indication that it was already committed to the deal, and of course it was. And, you know, the other people who were more in the know than we were, we weren't in that back room where this deal was stuck. AT&T was, Sprint was, T-Mobile was. Maybe they all knew about this because they were in the back room. We had to kind of figure it out by looking at the little hints that were dropped here and there. The Commission itself never said that there's a deal. Can you just explain to me again, without words like corrupt in back room, what exactly is the deal that, is the objection that the waiver was granted in exchange for an agreement to bid a higher reserve price, is that bid, is that the nub of the argument? It's not just that it was the higher reserve price, it was that they agreed to bid a certain price. And the mechanism that they used to do that was to set a reserve price at a certain level. And your argument is that waivers shouldn't be granted, they should only be granted based on the merits of the waiver itself without reference to an agreement to bid a reserve. Is that right? Yes. That's the whole, that's your whole argument. Yes, I'm saying that it was a cash for waiver deal. I'm asking you to leave aside the negative connotation language, I just want to know exactly what the exchange was that we're talking about. And what you're saying, if I understand it, the nub of the argument is the waiver was granted not only, or maybe not at all, because of the technical requirements, but because, at least in addition to an agreement to provide the reserve, right? Yes. Okay. And that was described in the file, public file, with respect to the waiver. Dish said that in its public file. Yeah. The FCC itself, the commission, the full commission, has never said that it actually. Well, the FCC said that you didn't have standing, so they will have to address that question if you do have standing, right? That's where we were before with respect to the waiver. Further questions? No. Thank you. May it please the Court. Maureen Flood for the Federal Communications Commission. NTCH's argument fails because NTCH cannot demonstrate. You should talk more into the mic. I'm sorry. I'm sorry. I don't know. Maybe you have to raise the. Yeah. There we go. Thank you. NTCH's argument fails, and this Court lacks jurisdiction over NTCH's petitions for review because NTCH has failed to demonstrate standing. NTCH's argument is. As to both? As to either? Are they tied together in the way that opposing counsel says? I believe so, Your Honor. NTCH's argument seems to be that the auction 96 reserve price was set too high. That's the basis of its injury, and that the reserve price was set too high because it was somehow contaminated by Dish's commitment to bid the reserve amount if the commission granted its waiver request. The two are tied together. From our view and our position before the Court is that NTCH lacks standing to challenge the reserve price because it can't demonstrate an injury flowing from the reserve price. NTCH fundamentally misunderstands the purpose of a reserve price in an auction. A reserve price is the price. It's the minimum price for a license. It's the amount below which the commission will not sell the license. In auction 96, the Wireless Bureau announced at the outset of the auction proceeding that it intended to use a reserve price that would be the aggregate of the winning bid amounts in auction 96. As we point out in our brief and the commission pointed out in its orders, that meant that nothing prevented NTCH from placing the winning bid for any license so long as the sum of the minimum sum. Their argument is that once Dish was committed to the large reserve price and it wanted all the licenses, it would have to bid up as high as necessary against NTCH in order to beat it, if that were the case, and then could bid perhaps less on others, but that the fact of a high reserve price meant that it had more than an incentive. It meant that it had an obligation to win bet every license. Your Honor, the reserve price, wherever it was set, could not have injured NTCH, and the reason for that is that the reserve price does not determine the bidding decisions of the bidders in the auction. Now you have to tell me why, because I just explained what their theory is now. Why is their theory wrong? Their theory is wrong because the commission could have set a much lower reserve price. NTCH asserts that we should have set a reserve price based on the sum of the minimum opening bids. We did that. I want you to leave all that out of it. I want you to just respond to their argument that the setting of a very high, what they regard as an unfairly high reserve price, affected how much Dish would spend on any particular license in competition with NTCH. We could have set a lower reserve price and Dish still could have outbid NTCH. Now going to this argument that the reserve price was so high and only Dish could effectively bid the reserve price, evidence in the record showed that not to be the case. When you say evidence in the record, that means those are facts which we get to after we decide standing. We assume that they are correct on the law and the facts with respect to their argument, that they would be injured if the facts sustain it, they would be injured if the law sustains it. Then we go on to the merits, and that's what you're arguing here. Your Honor, I go back to the point that if the reserve price, the level of the reserve price had no effect whatsoever on NTCH's ability to get a license, if the commission set the reserve price at $220 million, any bidder, Dish or any other bidder, could have come into the auction and outbid NTCH. It would be in the same position. So the level of the reserve price had no effect. It could have been $1.5 billion. It could have been $2 billion. It could have been $220 million. NTCH would go into the auction, and whether or not NTCH got a license wouldn't be determined by the level of the reserve price. It would be determined by the decisions of the other bidders in the auction. If the commission ---- which, under your hypothetical, they wouldn't be committed to making. Your Honor, Dish might have bid $1.564 billion, but for their commitment to bid. All they said is if you grant our waiver request, we will commit to bid that amount. They didn't say we would bid that amount. If that's your best argument, I don't see how you can win. Your Honor ---- They made an agreement that if you granted the waiver, they would bid a certain price. Now, you could say, well, maybe they wouldn't have, and maybe they didn't need the agreement. But the offer ---- I'm not saying there's anything wrong with the offer. That seems to me a different issue. But for the standing question, the fact that they make an offer makes a pretty good, sufficient causal relationship for the standing requirement. No, it doesn't, Your Honor. And I will turn to the merits in a second, because NTCH's argument also fails on the merits. But on that one, Dish could have ---- if Dish hadn't made that commitment and the Commission had set the reserve price at $1.564 billion without the commitment ---- Would they have made ---- if Dish had not made any commitment at all with respect to the reserve price, can you tell me for a certainty that they would ---- that the Commission would have made the same reserve price? Yes, Your Honor. Really? The Commission could have done that. The Commission ---- the wireless bureau at the outset of the proceeding announced that it intended to use an aggregate reserve amount. Dish was the only party that put an actual number in the record. Right. And in support of its rationale for the reserve price it set, the Commission cited the offer made by Dish, correct? That's correct, Your Honor. So on Chenery, we have to assume that if they ---- that if that's wrong for some reason, that they no longer have the same rationale. We have to send it back for a different rationale. But, Your Honor, the price proposed by Dish was supported, and this is the Dish ex parte, the September 9, 2013 ex parte, which you can find at Joint Appendix 50 and 51. The Dish ex parte was supported by three data points, and the wireless bureau in adopting the reserve noted that. There are three data points in the record. The first was the sale of similar spectrum in recent FCC auctions. The second was secondary market sales. And then the third was two reports by investment banks that had been previously filed with the Commission. Those ---- the recent spectrum sales and then also the secondary market sales and the results of recent auctions demonstrated that the price of the age block spectrum ---- Your position is that these theoretical arguments were sufficient without the actual offer made by Dish. Does the Commission say anywhere in its opinions that it would have done the same if Dish had not made this reserve price offer? If we had ---- we would have adopted the same reserve price if Dish hadn't adopted. No, Your Honor, because the wireless bureau explained when it denied NTCH's application for review that it decided to adopt the reserve price because it was reasonable standing alone. And it cited the three data points in the Dish ex parte letter. What those ---- what the letter showed, based on evidence that had been filed with the Commission, is that the Commission could have actually set a much higher reserve price. That the age block spectrum was valued at 60 cents to $1 per megahertz top, which would have allowed the Commission to set a reserve price at $2 to $3 billion. It was the Commission's predictive judgment. And the decision was reasonable at the time to look at the data in the Dish ex parte letter. Again, it was the only number that had been filed in the record. And say, well, looking at this evidence, we can predict that if we set the reserve at this amount, the age block licenses won't sell for below market values. And we also will satisfy our statutory objective to raise enough money for FirstNet. Now, I want to transition to Petitioner's argument that only Dish could have bid $1.564 billion for those licenses, and that somehow the waiver grant therefore infected the reserve price. The problem with that is that the evidence in the record, and the Petitioner even acknowledged this in his comments before the agency, the record showed that Dish likely wouldn't be the biggest bidder in auction 96. Going back to the Dish ex parte letter, if you look at footnotes 4 and 5, those footnotes cite two reports that have been prepared by J.P. Morgan and Deutsche Bank. They had been previously filed with the Commission. And what they predicted is that Sprint would be the big winner in auction 96, that Sprint would pay. Kennedy. Just goes to show you how good those reports were. So I don't understand. Citing a report that made the wrong prediction doesn't really support your proposition. Well, it does, Your Honor, because the reasonableness of the Commission's decision making is ex ante. And so when the Wireless Bureau adopted the auction 96 reserve price, the evidence in the record showed that it could have set a higher reserve price, a reserve price that exceeded 50 cents per megahertz pop, or $1.5 billion. And then if it adopted that amount, not only would you have Dish, one large player, bidding in auction 96, you would have another large player, which was Sprint. And so NTCH's argument here is that if we hadn't adopted, if we had set a lower reserve amount, it would have had a better shot at getting licenses in auction 96, because when we set the reserve at that amount, it would have foregone conclusion. You only have four minutes left. You better address the merits. Okay. Well, I am pressing the merits, Your Honor. So their argument is that it was a foregone conclusion that they would not be able to get any licenses because Dish would have to bid up all the licenses. Well, they can't demonstrate that that was the case. You can imagine a situation where Sprint came into the auction and bid against large licenses and the large markets met the reserve and left small licenses for smaller carriers like NTCH. NTCH, if it had gone into the auction, could have been outbid by a non-Dish bidder. The point here is that the reserve, NTCH cannot demonstrate standing, and it can't demonstrate that the reserve price was unreasonable because the record before the agency justified the reserve price. But it sure seems like there was a deal here, right? I mean, there's this flurry of activity all within a couple of days where it's related to the waiver, it's related to the bid. It looks like there's a deal. Are we supposed to shut our eyes to that? Well, Your Honor, there's no evidence in the record. You know, as you were discussing with the Petitioner, everything was transparent. I mean, if there was a deal, it was a front-room deal. Everything was out there. And NTCH took advantage of the fact that it could comment. I want to talk about the quick adoption of the reserve price because I bet that I want to talk about the deal. What was the deal, and what should we make of that? Well, Your Honor, again, I go back to the fact that the Commission could have adopted the reserve price even if Dish had never filed its waiver petition because that amount was reasonable standing alone. But they could have, but they did. I mean, there seems to have been a deal here that waivers are related to the bid that they're going to make. Now, is there anything amiss with that? Well, Your Honor, that goes in part to grant of the waiver petition. Fortunately, you don't have to reach the basis for the grant of the waiver petition because NTCH lacks standing to challenge the waiver. Imagine we don't agree with you. Yeah. I'm bothered by the deal. Should I be bothered by the deal? Your Honor, even if you accept that there was a deal, you shouldn't be bothered by the deal because the reserve price that the Commission adopted in Auction 96 was reasonable. So even if the Commission took into account, for the sake of argument, and we don't concede this, but let's say the Commission took into account Dish's commitment to bid that amount, the amount itself was still reasonable, and that amount would not have foreclosed NTCH's ability to bid for and win a license in Auction 96. Because the reserve price structurally could not have a negative impact on NTCH's ability to win a license. Again, I go back to the fact that we could have set a much lower reserve amount, and TCH still could have gotten outbid by Dish. And that was likely because Dish had all of the AWS-IV licenses that were adjacent to the H blocks. So going into the auction, Dish had a much greater interest in winning those licenses and deeper pockets. And independent of the bidding commitment in the waiver petition, Dish still might have gone into the auction and outbid NTCH. And that's why NTCH can't demonstrate standing to challenge the Auction 96 reserve price or the waiver petition insofar as it's arguing that the waiver petition infected the reserve price and somehow injured it. Also, I want to go to the waiver point. You know, you asked counsel for petitioner whether or not he has standing to make a standalone challenge to the waiver grant. And what he said is why the separate injury? Granted the waiver skewed the auction because it gave Dish an informational advantage. Well, NTCH lacks standing to challenge the waiver grant on that ground because, as we point out in our brief, NTCH elected not to qualify to bid in Auction 96 before the commission granted the waiver request. So the proximate cause of NTCH's injury is its decision not to bid, not grant the waiver petition.  You know, here there is ample evidence in the record that the reserve price was reasonable standing alone. And so the commission, you know, even if the commission considered Dish's commitment to bid the reserve amount, the reserve amount was reasonable standing alone. To answer your question, is it lawful in deciding a waiver question to decide based not only on technical requirements, but on an amount of money an applicant is willing to bid in a different proceeding? Your Honor, there is, that goes to the commission's grant of the waiver. The commission has a public interest standard that it applies when it evaluates a waiver request. The Bureau, not the commission, found that the bidding commitment would be in the public interest. If you disagree with that, there's no reason to reach the merits of the waiver grant because NTCH lacks standing to challenge the waiver grant. I know you have a nice fallback argument. I'm asking you to drop the fallback argument. That is, assume you have standing to challenge the waiver. Is the commission's position that it is permissible, lawful, to make decisions about waiver based on willingness to spend money on a different aspect of the spectrum? To my knowledge, Your Honor, the commission has never answered that question. Not only did it not answer that question, not only did the Bureau not answer that question in the waiver order, to my knowledge, the commission has never held that. I'm not aware of any precedent holding that to be the case. Further questions? Okay, thank you. Thank you. We used up some of your rebuttal time. You'll have another minute. I'm sorry, we used up all of your rebuttal time. We'll give you another minute. Okay, I just want to correct a couple of things that counsel for the FCC said. First of all, I want to make clear that our case is not just about the setting of the reserve price. We argued, once we understood that there was this deal between the commission and DISH, we argued that that affected the integrity of the whole auction, not just the reserve price, although it's quite obvious that none of the, you know, per megahertz pops things that were presented to the commission equated to 50 cents a megahertz pop. It was definitely related. How did it affect the entire? It affected the entire thing because unlike the other participants in the auction who were just bidding on the HBLOC licenses, effectively, DISH was bidding on getting that waiver grant. That's why there was an inequality between the two. So here we have another same problem again, which when I heard this argument, I was wondering why didn't I see this anywhere in the FCC opinion, which I didn't. And I thought, well, maybe it's because it wasn't in your application. I don't see it in your application. Well, we didn't put it in exactly those terms, but what we said was that it affected. My lawyer says we didn't put it in exactly those terms. I normally think that means we didn't put that in. Well, what we said was that it affected the integrity of the auction by adding this other element. But the argument that you're making, which I would call the Cadillac argument that you made in your brief, I don't see that anywhere in the application. I'm sorry. If you want to point me to a page, I'm very happy to look. But it's a very short application, and I didn't see it. Well, no, we did not. You don't even have to look. I'll tell you, we did not make that exact argument. But the fact of the matter is, I mean, one thing that came up in your discussion with FCC counsel, DISH had announced just a month before the whole deal was entered into the commission, that it did not intend to participate in any meaningful way in the HBLOC auction. A month later, all of a sudden it's completely changed its tune, and all of a sudden it's committing a bid of $1.5 billion in the auction. So obviously there was a big impact there. And as far as the reserve price, the whole discussion about whether we were diminished in our chances of getting a winning bid by the reserve price, the proof is in the pudding. I mean, DISH had committed to bid a certain amount. Yes, theoretically it could have bid $1.5 billion on one license, met the reserve, I mean, met its commitment to the FCC, and then let other people bid on the other licenses. But is that something they would rationally do? Since they had to bid $1.5 billion, they may as well get the licenses, too, that they had to bid on. And, of course, that's exactly what they did. They kept bidding and bidding, outbidding everybody. Finally, they had to bid against themselves to get up to the reserve price. That tells you right there that the reserve price was probably unreasonable, because the commission, but for the fact that it had this commitment from DISH, would have really been taking a huge chance of setting the price that high, it was much higher than it had been set in other auctions, that the whole auction would fail. And the record shows that it would have failed, but for the fact that DISH had to get up to that amount. Other questions? Thank you both. Thank you all. Thank you. We'll take this under consideration.
judges: Garland, Tatel, Griffith